[Civ. No. 1465.   Third Appellate District.—August 8, 1916.]

# BRYAN ELEVATOR COMPANY (a Corporation), Respondent, v. HERBERT E. LAW, Appellant.

CONTRACT—INSTALLATION OF ELEVATOR PLANT—UNSATISFACTORY CONTROLLING DEVICES—UNWARRANTED REMOVAL OF ENTIRE PLANT BY OWNER.—Under the terms of a contract for the construction and installation of an elevator plant and service in a building, the owner is not justified in removing the machines installed under the contract on the ground that the controlling devices furnished for the elevators were unsatisfactory, and in installing a particular type of controllers, which could not be purchased without also purchasing the machine itself, where the construction of the plant was in every other way satisfactory to the owner, and it is shown that other controlling devices were obtainable in the open market which could be used with the installed machines and purchased independent of the machines themselves.

ID.—SATISFACTORY PERFORMANCE OF CONTRACT—WHAT CONSTITUTES.—Where a contract requires work to be done to the satisfaction of the person contracting therefor, only such performance is required as is satisfactory to the mind of a reasonable person.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.   B. V. Sargent, Judge presiding.

The facts are stated in the opinion of the court.

Edgar C. Chapman, for Appellant.

Thomas, Beedy & Lanagan, for Respondent.

CHIPMAN, P. J.—In the first count of the complaint plaintiff seeks to recover the sum of sixteen thousand dollars upon a written contract entered into by plaintiff and defendant, January 20, 1905, for the construction and installation of an elevator plant and service by plaintiff for the Monadnock Building, San Francisco. The second count was for necessary repairs to the elevators, elevator equipments, and elevator hatchways in said building of the alleged value of $4,604.33. The third count is for elevator parts and supplies alleged to have been sold and delivered to defendant by plaintiff, for which defendant agreed to pay the sum of $2,053.10. Plaintiff had judgment on the first count for the sum of $13,375, with interest from May 1, 1908. The findings and judgment on the second and third counts were in favor of defendant.

Both parties appeal from the judgment. Defendant's appeal is presented in this record and plaintiff's appeal on the same transcript is presented in No. 1466. Defendant also appeals from the order denying his motion for a new trial. The cause was tried by the court without a jury. The issues tried may be understood from the findings of facts by the court:

"II. That thereafter and on or about the 1st day of September, 1905, the said plaintiff entered upon and commenced the installation of said elevators, and proceeded with said installation as rapidly as the unfinished condition of said building would permit. That on or about the 18th day of April, 1906, and prior to the completion of the installation of said elevators, said building was injured and almost completely destroyed by earthquake and fire; that by reason of the damage suffered by said building, through said earthquake and fire, plaintiff was unable to continue with the performance of its said agreement for a long time thereafter; that as soon as said building was sufficiently repaired to make the work of installation of said elevators possible, the plaintiff continued the work of such installation; that plaintiff at all times, in good faith proceeded with the performance of the obligations imposed upon it by said agreement and furnished the materials and performed the labor required of it by said contract and honestly and faithfully performed said contract and completed the performance thereof on or about the 1st day of May, 1908, except as regards the controlling devices

furnished by said plaintiff on the five passenger elevators which were not satisfactory to defendant and on account of which said defendant declined to accept the same and removed them from the building, and in this behalf the court finds: That said controlling devices did not operate satisfactorily and defendant was justified in rejecting the same and in removing them from said building and putting in other controlling devices. The court also finds that although said defendant declined to accept the said controlling devices as furnished by plaintiff and was justified in removing them from said building and in putting in other controlling devices, said plaintiff substantially performed the said contract.

"III. That the agreement hereinabove referred to was completed by said plaintiff on or about the 1st day of May, 1908, except that the defendant was not satisfied with the controllers on the said five passenger elevators and declined to accept the said controllers. That the length of time in completing said agreement by the said plaintiff was no greater than the amount of time said plaintiff was prevented from performing by the neglect of the said defendant in completing said building and by the earthquake and fire above referred to.

"IV. That in all regards, other than as above set forth, the plaintiff duly and faithfully performed all the conditions of said agreement above referred to on its part to be performed according to the terms of said agreement; that said plaintiff completely installed and equipped the elevators referred to in the said agreement in accordance with the plans and specifications attached to said agreement and made a part thereof, with the exception that the said defendant was not satisfied with said passenger elevator controllers or the elevator machines connected therewith and he declined to accept the same and removed all of said controllers and all of said elevator machines from said building and replaced the same with other elevator controllers and other elevator machines and installed said last mentioned controllers and machines in said building.

"That the reasonable market value of said elevator controllers and elevator machines so installed by said defendant was and is the sum of $15,156.00; and in this connection the court finds that the reasonable market value of said controllers so installed by defendant was and is the sum of $2625.00.

"But the court finds that defendant was not justified in rejecting the elevator machines so furnished by plaintiff or any of them and was not justified in installing other elevator machines in place of them, and that said defendant could and did replace said controllers with controllers of a design, workmanship and efficiency satisfactory to him for the sum of $525.00 each or a total sum of $2625.00. . . .

"VI.  That the sum of $21,375.00 is the reasonable value of the work done and the materials furnished by plaintiff in installing elevator machines and equipment for the defendant in said Monadnock Building, and the reasonable value of the materials furnished and accepted and the installation work accepted and used by defendant and that said defendant has paid plaintiff the sum of $8,000.00 and has suffered damages on account of plaintiff's failure to furnish controlling devices satisfactory to him in the sum of $2625.00; and that, after deducting from the contract price the said payment of $8,000.00 and the sum of $2625.00 to indemnify and compensate the defendant for the damages so suffered by him, there is now due, owing and unpaid from said defendant to said plaintiff the sum of $13,375.00, together with interest thereon at the rate of 7% per annum from the 1st day of May, 1908. . . .

"And as conclusions of law from the foregoing facts, the court finds the plaintiff is entitled to judgment against the said defendant for the sum of $13,375.00, together with interest on said sum from the 1st day of May, 1908, at the rate of 7% per annum, amounting to $4228.72, and for its costs of suit herein expended."

Plaintiff was properly to install, furnishing all the labor and materials therefor, four passenger elevators and one passenger elevator and safe lifter, and to alter the old passenger elevator then in use in the Bishop Building into a freight elevator, and to install two hydraulic ram sidewalk elevators, together with a flashlight signal system in accordance with certain plans and specifications made by Meyer & O'Brien, who were the architects of said building and of said work.

So far as this appeal reaches, the only dispute we are to settle relates to the installation of the five passenger elevators. And as to these the objection raised by defendant was to the unsatisfactory operation of the electrical controllers.

On November 5, 1906, defendant wrote plaintiff as follows: "In conformity with the provisions of our contract for elevators in the Monadnock Building, I advise you that the controlling devices are unsatisfactory and in my judgment inadequate for the requirements and therefore request that the control be replaced by that used by the Otis Elevator Co." Plaintiff replied, on November 9th, saying: "We cannot at this time accept a decision as to the controllers in the Monadnock Building, because in no case are those controllers complete and such as the design of the apparatus which we are to give you contemplates. Moreover as the writer explained to you sometime ago the present controllers are operating under conditions which are in no way a proper test of them, and further that the completion of the controllers is delayed purposely by us in order to keep machines in operation until the balance of the plant is ready to run, when the present controllers can be put into the condition which it is intended that they should be. The work on the permanent controllers is progressing as rapidly as circumstances will permit, and when completed and the present controllers finished and put in proper condition you will have no cause for complaint regarding them."

On June 5, 1907, defendant's manager, Mr. Huntington, wrote plaintiff as follows: "As Mr. Law has already notified you, we wish the controllers on the elevators now in the Monadnock Building changed to the Otis Elevator Company's controller. You may place it first on No. 2 elevator, and we will try it out."

The matter drifted along, the correspondence and the testimony showing that each party attributed to the other party the alleged failure of the controllers to give proper service, until, October 15, 1907, we find that plaintiff wrote defendant as follows: "Since writing to you yesterday we learn that you are taking our machines out of the Monadnock Bldg., and to this we make the most emphatic protest. We demand that we be allowed to demonstrate that these engines are all right by having them put entirely in our charge for sufficient time to prove our claims. All we ask of you is to have doors put on the engine room and have both your employees and all outsiders kept out of it. As our contract at the Monadnock Bldg. is not completed, we desire to know from you at once whether we shall go ahead with this final work? Await-

ing your immediate reply, we remain.'' Defendant replied, on October 17th: ''We have no objection to your completing your contract on the Monadnock Building in so far as it relates to the freight elevator in the back of the building and the two hydraulic ram sidewalk elevators.'' On November 29, 1907, defendant wrote plaintiff as follows: ''We have taken out the passenger elevators from the Monadnock Building, and they are now in the basement. What disposition do you desire made of them by us?'' On December 3d, plaintiff replied to this letter, stating: ''We have turned the same over to our attorneys.''

It does not appear at what date defendant removed the plaintiff's machines, but Mr. Robbins, manager of Otis Elevator Company, testified that the first bill rendered by his company was dated October 12, 1907, ''and that was not made until after the Otis machines were put in the building—after they were put in, the machines which they substituted were removed. I don't just remember the date when that was done.'' As we understand the evidence, the Otis machines were taken to the building about October 12, 1907, the plaintiff's controllers and machines were then removed from their settings and the Otis machines and controllers put in their place.

Defendant states in his brief: ''The court found. that the real defect in the elevator plant was in the controller, and we think it was justified in reaching this conclusion.'' The correspondence as well as the testimony shows that the construction of the elevators, the machinery and appliances used in operating the plant, except the controllers, were entirely satisfactory to defendant. The contract did not specify any particular type of controller, though doubtless plaintiff contemplated putting in the one it manufactured. The provision of the contract was: ''The contractor agrees that the elevator service going by the machines shall be continuous and that the control of the car shall be positive and the operation of elevators shall give satisfaction in every particular. In the event that the elevator machine or the controlling device proves unsatisfactory or inadequate to requirements, the contractor shall replace the machinery or controlling device with other machinery and control satisfactory to the owner. In the event of any dispute of the efficiency of any part of the

31 Cal. App.—14

elevator machinery or control, the decision of the owner is to be final and conclusive.''

It appeared from the testimony that the controller was so far independent in its construction that a controller of the Otis or any other design than the Bryan controller could be substituted and the engines and other machinery connected with and required in operating the completed elevator remain undisturbed. The court found and the evidence was that the Otis controllers had a value each of $525, and the five installed, $2,625.

The court found that the reasonable value of all the work done and materials furnished by plaintiff in installing elevators and equipment, ''and the reasonable value of the materials furnished and accepted and the installation work accepted and used by defendant,'' was $21,375, from which the court deducted the payment of eight thousand dollars, and the value of the five Otis controllers, $2,625, leaving due plaintiff $13,375.

The portion of the findings to which defendant now objects is the following: ''That defendant was not justified in rejecting the elevator machines so furnished by plaintiff or any part of them, and was not justified in installing other elevator machines in place of them and that said defendant could and did replace said controllers with controllers of a design, workmanship and efficiency satisfactory to him, for the sum of $525.00 each, or a total sum of $2625.00.'' Defendant's position is thus stated in his opening brief: ''These findings which we have just quoted cannot be harmonized in any way, for if under the evidence defendant was justified in rejecting the controllers, he was equally justified in rejecting the machines; not because the machines were defective in any particular, but because it was impossible to buy any controllers that could be used with these machines. The only proper controllers on the market were those manufactured by the Otis Elevator Company, and these could not be had, as we have pointed out, without the purchase of the Otis Elevator machines. It follows, therefore, that as Mr. Law was compelled to pay $15,156 for the Otis elevator controllers and machines, that he is entitled to deduct that amount from the contract price.''

The testimony was that the Otis Elevator Company would not sell its controllers to plaintiff or to defendant, without

also selling its machines to go with them. Witness Green-baum, a mechanical engineer and president of plaintiff company at the time the contract was made and up to 1909, was asked whether there were high-speed controllers in the market other than the Otis controller, and answered: "I believe one particularly was the Cutler-Hammer; another was the one sold by the Scheurman people, from whom I did buy one; there were quite a number of different style high-speed controllers at that time. There was a firm in Baltimore whose name I can't remember at the present time; and one in Chicago, and these firms made a specialty of making controllers and nothing else. They were not elevator men at all in any sense of the word. They simply make controller machinery, and in that machinery they make elevator controllers. Q. And they would send those controls to anybody who made application? A. Yes, sir." On cross-examination he testified that these controllers were all manufactured in the east and the manufacturers had no agency here; that he did not "tell Mr. Law anything about them," and that he did not believe them any better controls than his own.

The testimony was that, during all the time and up to the day it learned its machines were being removed, plaintiff was endeavoring to bring its elevators up to a standard of efficiency which would be reasonably satisfactory to defendant, and during all this time there was a constant controversy between the parties as to the way the elevators were being run by defendant's employees, plaintiff complaining that they were careless and inattentive to their duties in not properly caring for the machinery and in not properly operating the elevators; defendant contending that this was not true, and pointing out specific defects. And, finally, without previous notice of his intention so to do, defendant removed the machines and controllers and substituted Otis machines and controllers, and notified plaintiff to take its property away, which plaintiff did, under an agreement that in doing so the rights of neither party should be prejudiced. Witness Greenbaum testified on cross-examination as follows: "Q. What became of the machines after they were taken out? A. They were taken across the bay and stored. Q. Taken across the bay by yourself? A. We took them over there. Q. Where did you store them? A. In the Van Emon elevator plant. Q. What use was made of them subsequently? A. I

junked them. Q. Was there anything the matter with the machinery? A. No; not that I know of. Q. Then why was they junked? A. Because they were second-hand machines, and you can't sell second-hand machines, particularly what you call high-speed second-hand machines, to be installed in the building again. People won't take them." He testified that the reasonable value of the materials put in by plaintiff and removed from the building by defendant was ten thousand five hundred dollars—that is, the value of the controllers and engines and ropes or cables; "thirteen thousand five hundred dollars was the reasonable value of the work we furnished and left in the building at the time our machines were taken out, and that material and that construction were used by Mr. Law when he put in the new machines."

The inquiry seems to us to be narrowed to the question, Was defendant justified in substituting entirely new machines and controllers, entailing a loss to plaintiff of the machines and controllers installed by it? The court made no specific finding of the value of these machines and controllers, but it found the value of all the work done and machinery furnished to be $21,375, from which it deducted the payment made, eight thousand dollars, and the value of the controllers furnished by defendant, $2,625. The court found that defendant was justified in putting in the Otis controller, but in view of the testimony that a controller of other design could have been put in without removing plaintiff's machines, it found that the cost of these controllers, $525 each, was the limit of defendant's damage. And this narrows the inquiry still further to the single question, Was the plaintiff properly chargeable also with the cost of the Otis machines, which was $12,530?

What was the right with which the contract clothed defendant? It is not necessary to discuss the question as applicable to what defendant did in the present case. He decided that the Bryan controller was not satisfactory, and the evidence and the finding of the court sustained him in his decision. Neither is it necessary to discuss his right to have an Otis controller, for he got it and the court allowed him the cost of it. It is claimed, however, that because he was obliged to take and pay for the Otis machines in order to get the Otis controller, defendant was within his rights in removing plaintiff's machines, although he had made no objection to

them, and requiring plaintiff to pay for them. In support of this claim reliance is placed upon the case of *Singerly* v. *Thayer,* 108 Pa. St. 291, [56 Am. Rep. 207]. In that case Thayer made the following proposition to Singerly: ''I proposed to put my patent hydraulic hoist in your new building on Chestnut Street (including a duplex pump worth eight hundred dollars) according to verbal specifications given by your architect, for two thousand three hundred dollars, warranted satisfactory in every respect.'' Plaintiff in error accepted this proposition and the elevator was substantially finished, but proved unsatisfactory. He therefore declined to accept it, and gave notice that he desired it to be removed. This Thayer refused to do, and thereupon ''Singerly took it down and holds it subject to the order of Thayer, who brought the suit, claiming the contract price.'' In commenting upon the contract the court said: ''The proposition was made to induce him [Singerly] to purchase a kind of elevator not in general use. The fair inference is that he desired to procure one that would be satisfactory to himself. The manifest import and meaning of the language used is that it should be satisfactory to him. . . . He did not agree to accept what might be satisfactory to others, but what was satisfactory to himself. This was a fact which the contractor gave him the right to decide. . . . To justify a refusal to accept the elevator on the ground that it is not satisfactory, the objection should be made in good faith.'' The court found from the evidence, though conflicting as to the efficient working of the elevator, that it was sufficient ''to show the plaintiff in error acted in good faith and not in mere caprice in refusing to accept it.''

As we shall presently see, the authorities do not agree with the rule here stated—that it is sufficient if the purchaser ''acts in good faith and not in mere caprice.'' It will be observed that in the case cited the contract was for the purchase of an entire machine. In the present case the contract recognized two distinct parts—the machines and the controllers. In the case cited the hoist was regarded as a novelty in design, and the objection was to the working of the entire machine, which may have influenced the decision. It is possible the opinion would have been different had Singerly objected only to the duplex pump, which could have been supplied in the open market if the one furnished had been objected to. In the

case here the specifications carefully described all the various parts of the elevators which were to be furnished constituting the plant, the controllers being separately described. "The rule very generally adopted," as was stated in *Dodge* v. *Kimball,* 203 Mass. 364, [133 Am. St. Rep. 302, 89 N. E. 542], "is that, to entitle the plaintiff to recover, he needs to show only that he proceeded in good faith in an effort to perform the contract, and that the result was a substantial performance of it, although there may be various imperfections or omissions that call for a considerable diminution of the contract price. The reason for this construction of such contracts is in part the difficulty of attaining perfection in the quality of the materials and workmanship, and of entirely correcting the effect of a slight inadvertence, and the injustice of allowing the owner to retain without compensation the benefit of a costly building upon his real estate, that is substantially, but not exactly, such as he agreed to pay for. In none of the courts of this country, so far as we know, is the contractor left remediless under conditions like those above stated. The recovery permitted is generally upon the basis of the contract, with a deduction for the difference between the value of the substantial performance shown and the complete performance which would be paid for at the contract price." (*Harlan* v. *Stufflebeem,* 87 Cal. 508, [25 Pac. 686]; *Seebach* v. *Kuhn,* 9 Cal. App. 485, [99 Pac. 723]; *Hall* v. *Clark,* 7 Cal. App. 609, [95 Pac. 382].) In *Shepard* v. *Mills,* 173 Ill. 223, [50 N. E. 709], the contract was for the building of a heating apparatus. Among other things, the court said: "A literal compliance with such contracts is not necessary to a recovery, but it will be sufficient that there has been an honest and faithful performance of the contract in all its material and substantial particulars, and no omission on essential points, or willful departures from the contract; and mere technical or unimportant omissions will not defeat a recovery of the contract price, less any damages, however, requisite to indemnify the owner." (*Otis Elevator Co.* v. *Flanders Realty Co.,* 244 Pa. St. 186, [90 Atl. 624]; Page on Contracts, sec. 1387.) The evidence showed an honest and faithful endeavor to install an efficient controller. It is true this part of the elevator can hardly be said to be of slight importance, and an omission to supply a controller reasonably satisfactory would not have fallen within the category

of a slight deviation. But, slight or otherwise, the failure of the controllers first placed by plaintiff to prove themselves efficient was met and the cost allowed to defendant; in other words, the defendant got what he demanded and for the damage he was indemnified. If the cases cited do not apply strictly, the principle underlying them would seem to be applicable. We think, without doubt, had the Otis people allowed their controller to be used without compelling the purchase of their machines, defendant would have no ground of complaint.

The rule, as we understand it, found in *Singerly* v. *Thayer, supra,* that where the contract requires work to be done to the satisfaction of the person contracting for the work, his rejection of it cannot be called in question ''if he acted in good faith and not in mere caprice in refusing to accept it,'' we think is too broad and not in harmony with the generally accepted rule. It was said in *Gladding, McBean & Co.* v. *Montgomery,* 20 Cal. App. 276, 279, [128 Pac. 790]: ''A stipulation in a contract to perform to the satisfaction of one of the parties only calls for such performance as should be satisfactory to a reasonable person.'' (Citing cases.) In *Keeler* v. *Clifford,* 165 Ill. 544, [46 N. E. 248], the action was to recover for certain grading and leveling done under a contract which provided that all grading was to be done to the satisfaction of said Keeler. The court said: ''Where a contract is required to be done to the satisfaction of one of the parties, the meaning necessarily is that it must be done in a manner satisfactory to the mind of a reasonable man. The plain construction of the contract in this regard is that the work was to be completed in accordance with the contract, in such a manner that appellant, as a reasonable man, ought to be satisfied with it.'' (*Hawkins* v. *Graham,* 149 Mass. 284, [14 Am. St. Rep. 422, 21 N. E. 312]; *Richison* v. *Mead,* 11 S. D. 639, [80 N. W. 131], and cases cited in the opinion.)

Under the rule contended for by appellant it would be difficult, if not impossible, to show that the party was not acting in good faith, and his right to say he was not satisfied would be practically arbitrary, excluding all question of its exercise being reasonable or unreasonable.

In the present case appellant not only refused to be satisfied unless Otis controllers were used, but he claimed the right to exercise this refusal, knowing that these controllers

could not be obtained without purchasing machines, at great cost, which were not essential to their use. He at no time requested plaintiff to obtain controllers other than the Otis controllers, several of which were obtainable in the open market. Without previous notice to plaintiff, or its consent, he removed plaintiff's machines and controllers and installed the Otis machines and controllers. Under the existing circumstances we think it would be unreasonable to hold that the contract permitted him to exercise what was little short of an arbitrary power.

The judgment and the order appealed from are affirmed.

Hart, J., and Ellison, J., *pro tem.*, concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 5, 1916.